T.C. Summary Opinion 2001-125

UNITED STATES TAX COURT

WILLIAM A. RICKER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14677-99S.                    Filed August 16, 2001.

William A. Ricker, pro se.

<u>James F. Prothro</u>, for respondent.

ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time that the petition was filed.[1]  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

---

[1] Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for 1995, the taxable year in issue.

Respondent determined a deficiency in petitioner's Federal income tax for the taxable year 1995 in the amount of $2,594. The sole issue for decision is whether petitioner is entitled to a disabled access credit pursuant to section 44. We hold that he is not.

Background

Some of the facts have been stipulated, and they are so found. Petitioner resided in Burleson, Texas, at the time that his petition was filed with the Court.

## A. Petitioner's Dental Practice

Petitioner is a general practitioner of dentistry. After graduating from Baylor Dental School in 1984, petitioner practiced dentistry in association with other dentists until 1994. Since 1994, petitioner has practiced as a self-employed dentist in Burleson, Texas, a bedroom community of Fort Worth.

During 1995, the taxable year in issue, petitioner employed three individuals in connection with his dental practice, which generated approximately $260,000 in gross receipts. During 1994, the preceding taxable year, petitioner employed the same number of individuals, and his practice generated approximately the same amount of gross receipts.

As a general practitioner of dentistry, petitioner provides an array of dental services, including orthodontic care, extractions, fillings, crowns, endodontics, and root canals. In

connection with his practice, petitioner uses x-ray equipment to diagnose and treat his patients. Prior to 1995, petitioner used a Siemans x-ray machine that produced periapical-view x-rays.

The Siemans x-ray machine involves a moveable "cone" that is mounted on a mechanical arm and that is positioned to the side of a patient's cheek. The periapical x-rays are "little bitty films that fit inside the patient's mouth", which may cause a "gag reflex" in some patients. The x-rays that are produced may give rise to a "full-mouth series" of 18 radiographs that provide a clear view of the bone structure and health of a patient's teeth. However, the cost of the Siemans x-rays, and particularly a full-mouth series, is relatively expensive. Concerned with the limited scope of the Siemans x-rays and the discomfort to the patient, petitioner sought to expand and improve the quality of the dental x-rays produced, and at a lesser cost.

B. The Panoramic X-Ray Machine

In January 1995, petitioner purchased and placed in service in his dental practice a previously-owned "J. Morita Versaview Panoramic X-Ray" machine (the panoramic x-ray machine) for $5,000. The panoramic x-ray machine is designed to radiograph a panoramic view of a patient's teeth. The patient remains stationary while the mechanism orbits around the patient's head emitting x-rays as it moves. When the mechanism finishes its orbiting cycle, the result produced is a 5- by 12-inch

radiographic picture.  The panoramic x-ray is used primarily as a preliminary diagnostic technique, focusing attention on areas that may pose increased concern.  The cost of the radiograph that the machine produces is cheaper than a "full-mouth" series produced by a standard dental x-ray machine.

At the time that he acquired the panoramic x-ray machine, petitioner had the option of purchasing, as an accessory at an additional cost, a patient chair that could be affixed to the base of the machine.  Petitioner opted against purchasing the patient chair.  Without the chair, patients customarily stand while holding handles to maintain stillness and "bite on a little piece to position their head", whereas patients who are confined to a wheelchair are instructed to do the same while remaining seated in their wheelchair, which is rolled directly under the machine over a flat base.  Thus, by opting not to purchase the accessory chair, petitioner reduced the acquisition cost of the panoramic x-ray machine and avoided the risk inherent in transferring a disabled patient from chair to chair, but without compromising the diagnostic value of the x-ray machine to able-bodied patients.

Petitioner uses the panoramic x-ray machine on a daily basis and for all of his patients without regard to whether an individual is disabled or able-bodied.  Indeed, the machine is intended to improve the standard of care for all patients and was

not specifically designed to facilitate the treatment of disabled individuals.

C.  The Wehmer X-Ray Machine

In December 1995, petitioner purchased and placed in service in his dental practice a "Wehmer Counterbalanced Cephalometer System X-Ray" machine (the Wehmer x-ray machine) for $2,725.  The Wehmer x-ray machine produces a radiograph of the patient's entire head, focusing on the jaw and its structure and alignment and the teeth and their position and alignment.  The machine operates at a distance of approximately 5 feet from the patient's head and rotates to produce either lateral, oblique, or frontal views.  The result is a 9- by 10-inch radiographic picture.

According to the manufacturer's brochure, the Wehmer x-ray machine produces a "cephalogram" that

> enables the practitioner to accurately measure the angular relationships between various facial components and the head.  It is used to help identify facial abnormalities in relation to dentition; to project the growth and development patterns of facial components; and to plan and monitor treatment by superimposing successive cephalograms and measuring the changes due to growth and orthodontic treatment.

In addition to its ability to detect skeletal deformities and deficiencies in bone growth, the Wehmer x-ray machine is "essential for diagnosis and treatment" and is used by "general dentists" who plan to expand their practice into orthodontics and cosmetic dentistry.  The machine is considered the standard of care for orthodontic treatment.

Like the panoramic x-ray machine, the Wehmer x-ray machine is vertically adjustable. Thus, like the panoramic x-ray machine, patients customarily stand while the Wehmer x-ray machine is in use, whereas patients who are confined to a wheelchair may remain seated in their wheelchair.

Again, like the panoramic x-ray machine, the Wehmer x-ray machine may be purchased with an accessory chair at an additional cost. Petitioner chose not to purchase the accessory chair, thereby reducing the acquisition cost of the machine and avoiding the risk inherent in transferring a disabled patient from chair to chair, but without compromising the diagnostic value of the machine to able-bodied patients. As with the panoramic x-ray machine, a patient who is confined to a wheelchair can easily access the open space beneath the Wehmer x-ray machine.

Along with the Wehmer x-ray machine, petitioner purchased a "Wehmer Rare Earth Cassette with Screens" (rare earth cassette) for $299. The rare earth cassette is an "amplifying screen" that serves to reduce the amount of radiation emitted from the Wehmer x-ray machine.

Petitioner uses the Wehmer x-ray machine and rare earth cassette on a daily basis and for all of his patients without regard to whether an individual is disabled or able-bodied. Indeed, the machine and cassette are intended to improve the standard of care for all patients, and neither was specifically

designed to facilitate the treatment of disabled individuals.

D.  Petitioner's Patient Population

In 1995, petitioner's patient population consisted of about 2,000 individuals, representing a broad spectrum of the local community.  Of those individuals, fewer than 5 percent were confined to a wheelchair.

Prior to petitioner's purchase of the panoramic x-ray machine and the Wehmer x-ray machine, none of petitioner's disabled patients complained about the x-ray machines then in use in petitioner's office.  Petitioner did not purchase either x-ray machine at the suggestion or recommendation of any of his disabled patients, nor did petitioner consult with any of his disabled patients regarding the purchase of either machine.

Prior to his purchase of the panoramic and Wehmer x-ray machines, petitioner did not refuse treatment to a prospective patient because the patient was confined to a wheelchair.  At the time that he purchased those machines, petitioner was in compliance with applicable requirements of the Americans With Disabilities Act of 1990 (ADA), 42 U.S.C. secs. 12101-12213 (1995).

Petitioner purchased both the panoramic and Wehmer x-ray machines in order to provide better care to all of his patients, without regard to whether any particular individual was disabled or able-bodied.

E.  Petitioner's 1995 Income Tax Return

Petitioner filed a Federal income tax return for 1995 and claimed thereon a disabled access credit in the amount of $3,887. In support of the credit, petitioner attached to his return Form 8826, Disabled Access Credit, on which he computed the credit as follows:

```
Total eligible access expenditures
    Panoramic x-ray machine   $5,000
    Wehmer x-ray machine       2,725
    Rare earth cassette          299    $8,024
less: Minimum amount                      -250
Balance                                  7,774
Applicable percentage                      50%
Disabled access credit                   3,887
```

F.  Respondent's Notice of Deficiency

In the notice of deficiency, respondent disallowed the disabled access credit for 1995 on the ground that the panoramic x-ray machine, the Wehmer x-ray machine, and the rare earth cassette do not constitute eligible access expenditures within the meaning of section 44.  Rather, respondent treated the cost of acquiring the x-ray machines and cassette "as a depreciation expense under Section 179".

G.  Petitioner's Contentions

Petitioner candidly admits that his purchase of the panoramic and Wehmer x-ray machines was not motivated by any requirement of the ADA and that both machines are "usable to provide services to patients without disabilities as well as

patients with disabilities". Nevertheless, petitioner contends that he is entitled to a disabled access credit under section 44 because "the design of these machines allows me to provide the same quality and breadth of services to my disabled patients as I provide to my other patients", or, in other words, because "The machines that I purchased prevent discrimination against disabled persons."

Discussion

Subject to various limitations, an "eligible small business" is entitled to a disabled access credit for "eligible access expenditures" for the taxable year. Sec. 44(a).[2] In the present case, there is no question that petitioner qualifies as an "eligible small business" for the year in issue. Sec. 44(b).[3] However, the parties disagree on whether the cost of the

---

[2] Sec. 44(a) provides as follows:

SEC. 44. EXPENDITURES TO PROVIDE ACCESS TO DISABLED INDIVIDUALS.
    (a) General Rule.--For purposes of section 38 [General Business Credit], in the case of an eligible small business, the amount of the disabled access credit determined under this section for any taxable year shall be an amount equal to 50 percent of so much of the eligible access expenditures for the taxable year as exceed $250 but do not exceed $10,250.

[3] As relevant herein, sec. 44(b) defines "eligible small business" to mean any person (1) whose gross receipts for the preceding taxable year did not exceed $1,000,000 or who did not employ more than 30 full time employees during the preceding taxable year and (2) who elects the application of the section for the taxable year.

panoramic and Wehmer x-ray machines and rare earth cassette constitutes "eligible access expenditures" within the meaning of section 44(c).

In order to qualify as "eligible access expenditures", amounts must be "paid or incurred by an eligible small business for the purpose of enabling such eligible small business to comply with applicable requirements under the Americans With Disabilities Act of 1990 (as in effect on the date of the enactment of this section)."  Sec. 44(c)(1).

Section 44 was enacted on November 5, 1990, as part of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11611(a), 104 Stat. 1388, 1388-501.  Section 44 is intended to complement the ADA by providing "relief to small businesses making accommodations required by the ADA."  136 Cong. Rec. S12852 (daily ed. Sept. 12, 1990) (Statement by Senator Kohl). The legislative history indicates that Congress was concerned that the requirements contained in the ADA may impose a severe financial burden on certain small businesses.  See H. Conf. Rept. 101-964, at 1138-1140 (1990).  In order to alleviate the burden, Congress provided small businesses with a tax credit for a portion of the costs incurred in complying with the ADA.  See id. If the expenditure was not made to enable compliance with the ADA, then the expenditure does not qualify for the credit under

section 44.  <u>Fan v. Commissioner</u>, 117 T.C. ___ , ____ (2001) (slip op. at 11).

Congress enacted the ADA to establish a clear and comprehensive Federal prohibition of the discrimination on the basis of disability in a number of areas, specifically including public accommodations.  H. Rept. 101-485 (Vol. II), at 28 (1990); see also 42 U.S.C. sec. 12101(b) (1994).  Petitioner's dental practice is a place of public accommodation within the meaning of the ADA.  See <u>Fan v. Commissioner</u>, <u>supra</u> (slip op. at 7).  We therefore focus our attention on Title III of the ADA dealing with public accommodations.  42 U.S.C. secs. 12181-12189.

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. sec. 12182(a).  Title III specifically defines discrimination to include a failure to take necessary steps to ensure that no individual with a disability is denied services because of the absence of auxiliary aids and services. 42 U.S.C. sec. 12182(b)(2)(A)(iii).  As relevant herein, the term "auxiliary aids and services" includes the "acquisition or modification of equipment or devices; and other similar services and actions."  42 U.S.C. sec. 12102(1)(C) and (D).

The ADA does not elaborate further with respect to the aforementioned categories of auxiliary aids and services. Rather, the final regulations implementing the ADA provide only examples of auxiliary aids and services in the areas of hearing and visual impairments. See 28 C.F.R. sec. 36.303(b) (2000); see also Fan v. Commissioner, supra. Absent in these regulations is any mention of x-ray machines, much less dental x-ray machines.

Petitioner contends that his purchase of the panoramic and Wehmer x-ray machines and rare earth cassette enabled his dental services business to comply with applicable requirements of the ADA and that the cost of the x-ray machines and cassette therefore qualifies as "eligible access expenditures". We disagree.

Initially, we note that petitioner was already in compliance with the ADA at the time that he purchased the panoramic and Wehmer x-ray machines. Petitioner did not discriminate against, or refuse to treat, disabled patients "on the basis of disability". 42 U.S.C. sec. 12182(a). Nor did petitioner fail to take necessary steps to ensure that no individual with a disability was denied services because of the absence of auxiliary aids and services. See 42 U.S.C. sec. 12182(b)(2)(A)(iii).

Prior to petitioner's purchase of the panoramic and Wehmer x-ray machines, none of petitioner's disabled patients had ever

complained about the type of x-ray equipment then in use in petitioner's dental practice. Moreover, prior to purchasing those x-ray machines, petitioner had never consulted with any of his disabled patients regarding his intention to acquire the machines.

Essentially, petitioner was under no compulsion to purchase the panoramic and Wehmer x-ray machines. Petitioner candidly admits that he did not purchase either machine in order to comply with any requirement of the ADA. Rather, petitioner purchased the machines in order to provide all of his patients with better dental care.

Petitioner did not make any modification to either the panoramic or Wehmer x-ray machine for the purpose of treating any of his disabled patients. Petitioner specifically declined to purchase the x-ray machines with an installed patient chair. Petitioner regards this decision as evidence of his desire to better serve his disabled patients. In petitioner's view, the x-ray machines that he purchased "allow the ability to place handicap patients in it * * * You can simply roll the wheelchair into the machine." However, petitioner also admits that his "machines serve everyone" and "afford me an ability to more readily get radiographs on [the patients]."

The panoramic and Wehmer x-ray machines are standard machines used in the field of dentistry and are likely to be

found in most modern dental offices.  Neither x-ray machine was designed or marketed to facilitate accessibility to disabled patients.  Rather, each machine has general applicability and usefulness to all dental patients.

Thus, nothing in the record suggests that the panoramic and Wehmer x-ray machines qualify as auxiliary aids or services.  42 U.S.C. sec. 12182(b)(2)(A)(iii); Fan v. Commissioner, supra. Therefore, the cost of the machines and rare earth cassette is not an eligible access expenditure within the meaning of section 44(c).  Accordingly, the machines and cassette do not qualify for the disabled access credit under section 44(a).

Reviewed and adopted as the report of the Small Tax Case Division.

In order to reflect the foregoing,

Decision will be entered for respondent.